315-0464, Stephen Davis, appellant by George Brugis v. Burlington Northern Santa Fe Railway Company, Appalachia, by Brad Elgin. My name is George Brugis, I represent Steve Davis, and this is the FELA case. So sometimes it's good when you have these statutory clauses of action to actually go back and look and see what the impetus was for Congress to pass this law. And when you look at most of the appellate court opinions on FLA cases, they usually start out with these statements about how the railroad industry was back in the late 1800s and 1900s and Congress decided to put on the railroad the cost of some of the lives and the legs and the arms that were used up in the operation of the railroad. And Congress makes it very, very clear in the United States Supreme Court and Illinois appellate courts have made it very, very clear that this is a statute that's going to be liberally construed in order to compensate injured railroad workers. And I think that's what we have to do here is look at whether or not, one, the railroad violated this federal regulation, and whether or not the federal regulation violation had anything to do with an older apartment or house site with Steve Davis being hurt. So we're here because the railroad violated the law. I don't think that's in dispute. There's a very, very important federal regulation that says that when they have this new system, this fairly new setup, where they have the two locomotives in the front and then the helper locomotive in the rear, there's potential for a lot of disaster like what's going on in the Columbia River right now when they don't follow the regulations. And so the regulation says that when you have this helper locomotive, it has to communicate with the lead locomotive. This one didn't. It's not disputed. So they had to cut it out of the train and they left it on the main line. So it's an important fact that they left it on the main line because a locomotive on the main line is in use. A locomotive that's in use is not in use when it's in a stall being repaired or being inspected. What you look at in these cases is whether or not when you're trying to decide whether or not a locomotive is in use under the Locomotive Inspection Act, it's that period of time when it's leaving the stall in the roundhouse and moving to the main line because at some point between being in the stall and being in the main line, you pass that line between being serviced and maintained and being in use. There's no cases that say a locomotive that's on the main line is not in use. All the cases that they cite and what the law is, is that a locomotive is not in use when it's in the stall, in the roundhouse, under the control of the maintenance department people. Davis was an over-the-road conductor and he's with an over-the-road locomotive engineer and their normal job duties are to go to work, they get assigned a locomotive, some cars, and they go out on the main line and they service these industries, take out the empties and put in the loads or vice versa. Today, on the day he was hurt, he is assigned this different job because this 6203 broke down and it was on the main line, on the K line, blocking traffic. So they said go out and get it and the train master drove him out there, him and his engineer. They broke it down because of the lack of communication between the head and the rear. Yes, and that's a federal defect and everyone agrees on that. I think they admitted in their brief at four or five different times that it wasn't communicating and it's required by federal law to communicate and it wasn't and that's why it was left there. It comes in, it's a Givens case that I'm chagrined to say wasn't in my list of cases but it's cited on page 24 in my brief. Givens is an old case, that's good law, where similar situation, the train breaks down, I mean it wasn't a distributed power unit but the train breaks down and they send the guy a half mile down the track because it was before the days of signal to flag so another train doesn't come and crash into the back of the train. He's going to stop the trains and he gets frostbite and the court said that the Locomotive Inspection Act violation because this train broke down was a cause of the guy getting frostbite or at least it's a question for the jury. The jury agreed it was a cause and awarded him money and the appellate court affirmed it. So there's a lot of different issues here and Judge Shiplett decided it in use and I think that's the main issue we have to look at is in use but I'm just afraid and I want to talk about some of these other issues and I talked about them in my brief because I guess you could look at any issue and decide whether or not to affirm them but this is a case that should be tried. Davis deserves his day in court because the railroad broke the law, they broke the FDLA and they violated the FDLA because they violated the Locomotive Inspection Act and they violated the Locomotive Inspection Act because this locomotive was in violation of the federal regulation and that was a cause of Davis' injury because it played some part no matter how small in causing his injury. He was dealing with a violation of the Locomotive Inspection Act when he was hurt and when he's dealing with a violation of the Locomotive Inspection Act, that's a question of fact for the jury to determine whether or not it was a cause of his injury. And that causation analysis applies until Davis is done dealing with the defect and he's reached a place of safety and he's doing something else and that's basic FDLA jurisprudence and it has been. You look at the DELT case, the United States Supreme Court case that was relied upon in Brady and the in-use analysis and it's the law up until BALO in 2011 that you look at this in-use analysis and it's a very liberal analysis and I don't see how it even applies here when you have over-the-road crew dealing with a defective locomotive on the main line. It's not even close to being in a repair kit. It's not in the possession of mechanical department people. There's really no issue of in-use. So I think we get by the in-use argument. Clearly it was in-use under all these cases and then was it a cause? There's a question of fact for the jury whether it's a cause. Was there a medical causation? Dr. Stapnu said climbing up onto the locomotive engine was in his opinion the cause of his knee injury that eventually he's going to need a total knee replacement for. So the torn meniscus that he sustained in this accident is a cause and holder part of the injury. Doesn't Mr. Elwood argue that the engine was on its way to the repair shop? Doesn't that essentially show that it's not in use? That it's diverted in that direction? So, I mean, I guess every engine is on its way to the repair shop. I mean, it's in use. It's on the main line. It's in the possession of operating people and at some point, you know, it's going to go to the repair shop. And that's really, you know, that's where the in-use analysis comes in. It's not when it's on the main line in the possession of operating people. No court has ever said that that's not in use. It's when it gets to the repair shop and now you have a hostler who maybe has it on a yard track or a mechanical department who has it on a yard track and is going to pull it into the stall. When in that, you know, period of time does it stop being in use under repair? And that's the Angel case and the Illinois case of Edwards where in both those cases the court held it was in use, but it was a machinist who was actually operating the locomotive, but in both those cases they said it was in the stall. They did all the work. They were backing it out of the stall and even though it was a mechanical department person, he was on the yard track bringing it to hook it up to a train and because he was so close to being an operating person and having this thing go into use that we're going to say that in a liberal interpretation of the Locomotive Inspection Act with an eye towards compensating these injured railroad workers, we're going to hold that it's in use under the statute. But this isn't even close to that because you have it on the main line still and you have operating department personnel who are operating the locomotive bringing it to the brown house. In Vallow they use the totality of the circumstances test and they go through factors. When you go through those factors, what you're saying an important factor is the train was located in the main line at the time of the injury, alleged injury. So another factor is the activity of the injured department and what was his activity? So his activity is, I think, see a lot of these cases it's hard to look at those factors because they're looking at is this a machinist who's taken apart off a locomotive. This is a conductor. This is a conductor who's operating, his job is to watch the signals and look at the train papers to make sure that what their orders are and to be an integral part of the crew in operating the train safely on the main line. So when they talk about the activity of the person, they're saying, you know, like the machinist in Edwards or Angel. You know, here's a machinist but what was his activity? Was he working as a machinist taking part in the locomotive to fix it or was he operating it like a locomotive engineer on a yard track taking it? Well, in that case, the activity of the person, it didn't really matter that he was a machinist, but he was acting like a locomotive engineer, his activity was operating it. So it's hard to analyze, you know, what Davis was doing because it's so clearly he's an operating guy. He's a conductor. He has his train orders and he's getting on the engine with the engineer to operate it on the main line. This was not in the rail yard or not in the ground. Undisputed, it's on the main line. It's on the K line. Left in the main line and that's another thing Davis was mad about. If you get away from the locomotive inspection act, just the negligence part. Why did they leave it there? They had a crew there. The brown house wasn't that far away. The axle track wasn't that far away where they were going to leave it. It would have taken them an extra 15, 20 minutes to have that crew move it. So Davis was scratching his head why they left it blocking traffic on the K line. Yeah, it was on the main line, undisputed. So I think if we look at the context here of the FALA and the locomotive inspection act, that it's designed to compensate these injured guys. It's dangerous work. Sometimes, you know, with the railroad, God love them, but you have to use a two-by-four to hit them on the head to make them operate safely. And that's what Congress said and the United States Supreme Court has said, you know, since 1911, that we're going to make this a very strict liability statute. If there's any violation, it's strict liability. And if there's any causation in whole or in part, no matter how slight, we're going to let the jury decide. The jury is ultimate. It's a very integral, important part of the statute, given these injured railroad workers their day in court. And that's what Congress says and the Supreme Court and the Illinois courts have said over and over again, give them their day in court. And, you know, that's all Mr. Davis and I are asking, is let a jury decide this. Okay. Thank you very much. Thank you. I'm sure that Mr. Dell went to this two-by-four. Yeah, I did. Thank you, Brad Owen, on behalf of Burlington Northern and Santa Fe. I want to start out with just a comment real quick from the Airfield case that we cited in our brief. Airfield says, a court must decide in use as a question of law. It may not submit a question to the jury as an issue of fact. They're asking us to do that here. I think the case law in this case, as it applies to this case, is clear. That if we start out with the question of was this engine in use at the time of this incident, remember the incident is a gentleman stepping up onto a ladder and his knee gives out as he's stepping up. This isn't a question of something on the train that was defective that the person stepped on something and it broke and he fell through, or a railing gateway and he fell off the train. That's not the standard we use in FAA cases, is it, what you're just saying? No, my point is the defective. The question is if it's in use. You're talking about in use. Well, I'm talking about how the accident happened here, just to put it in context of the claim itself, and I think that's important. And it will become more important later when we talk about whether or not there was actually even a violation established as they're contending. But I think the question first is was this engine in use? And it clearly, from the facts in this case, had been withdrawn from use. It had been taken away and split from the coal train, which went on to complete its run to its destination. The engine was taken off. It was placed on a side track with the intention that it would be moved to the axle line and then brought back for further inspections. There's no question that the train was taken out of commerce, that it was taken out of transportation, that the engine would not proceed to its destination, and that there was going to be further inspections to determine what the problem, if there was one, was. And so I don't think there can be really any dispute about whether this engine had been taken out of use at the time of this accident. Now, counsel wants to argue about the fact that led to this accident, but when we look, what have they established? The evidence shows that there was a lack of communication between the lead engine and the DP engine, which was 6203. That's a violation of the act. Pardon me? That's a violation of the act. But if you assume that there was a disconnect and there was a defect with that, it could be, yes. But the thing here was... It could be. If there was no communication, it's a violation of the act. It could be. It could be. But here, when the engine itself was inspected, preliminarily inspected, they couldn't find anything wrong with it. They just couldn't make it connect up. Now, some of the evidence in the case was it could have been the geography of the area that was causing the lack of communication between the engines. He couldn't find any problem with the engine. The engine could operate safely, and I think that's key. The engine could operate safely as a solo engine or driving itself or even a lead engine on its own train. So the defect, if you want to say there was a defect, played no role in this type of accident. And, again, I go back to my initial comment. This accident happened because he was stepping up, climbing up a ladder to get onto a train, and his knee popped. Now, isn't that a – you just commented on something that's not the standard in IVL cases, as I understand it. Does there have to be a connection with the alleged defect? And it's connected to what the guy did, stepping up the ladder? Well, it's my understanding that they have to establish a violation, but the violations – Once they establish a violation, if they establish a violation, then it's a question of – Causation. Right. And it's not like the normal negligence cases we have or even workman's crime. Well, no, that's true. That's true, and I acknowledge that. Yes, I didn't mean to assert that it was different. I was just putting into context what really happened here as far as the accident itself, the physical accident that they're claiming. When does it become a fact question? Pardon me? When does it become a fact question? You're arguing whether these rocks or whatever were a fault of the inherent act. I think I misunderstand your argument. Well, they've raised two different arguments. They've alleged there was a violation of the Locomotive Expansion Act. And secondary, they've alleged that there was some negligence associated with the rock where he was stepping. But I don't think there's any evidence at all to indicate that there was anything wrong with the rock that he was stepping on. And if you look at his testimony, his testimony was clear that he was lifting one leg – had one leg on the ladder and was pulling himself up when his knee gave way. And so the mechanics of the accident are walking or climbing up the stairs to get onto the locomotive. I don't think they presented any evidence, one, that there really was a violation of the act, that there really was a lack of communication. I mean, it was hinted at, discussed, but there was really no evidence to indicate that there was a defect in the train in 6203. There's no evidence that there was a defect. Why was it disengaged from the rest of the train? They weren't connecting, Your Honor. And I think that's a different issue than whether there was a defect in 6203. You could have a lack of communication. They weren't communicating, what you mean? Pardon me? They weren't communicating. They weren't communicating. But it doesn't mean that there's a defect in 6203, and that's the point that we tried to make, and that's what Palsgrove said in his deposition. That could have been the geographics. And again, even if seemingly there was a defect in the communication ability, I think counsel at trial made a really good remark in the summary judgment disposition. He said, it's like having a car with a radio that doesn't work. The car is still operable in every way, but you just can't listen to the radio. It's the same situation here. If you take what they're saying and it's true, how does that have any implication whatsoever for what happened with this car? That's the big difference, isn't it? Because in the railroad law, if you've got a locomotive at the rear, that locomotive has to always be in communication with the front. I agree. And so in this case, it wasn't, right? I think there's a difference here. Had that locomotive not been severed from that train and we had some type of accident and you had the two engines not communicating with each other while that train was on its way to its destination, we have a different set of facts here. But here, once that engine was severed, the fact that it didn't have, there was some inability to communicate with the lead engine, it didn't affect the operational use of that engine. It didn't affect the ability to operate that engine safely. Doesn't that argument defect defeat your argument on in-use? This engine could be used and the destination was the roundhouse. The determination had not been met. And the question is, could it be used in commerce or could it be used in transportation? And it has not been cleared to do that yet. And I think that's the thing here. They want to say that simply because, two things, they want to make a bold statement, a bright line rule that says, anytime an engine is on a mainline and anytime that engine is being worked upon or operated by operators as a conductor here, that's automatically in-use. And that flies in the face. I think their argument is, anytime it's on the mainline and capable of being operated under its own steam, it's not being pulled or towed or pushed, that bright line is, if it's being operated by operational personnel on the mainline and under its own steam, so to speak, that's in-use. But the Baylor case, I think, and the other cases from the Fourth Circuit that Baylor relied upon have gotten away from a bright line standard and have applied a multiple factor analysis to be looked at in every case. And I don't think that simply because an engine is still on a mainline and there are issues that need to be further investigated and it's been severed from the train that it was affiliated with, that that is still in-use because, obviously, it's been taken out of commerce, it's been taken out of transportation, and there's a question as to its continued viability to operate. It's certainly not being used in the course of any transportation, just to take it back to the yard. You know, the gentleman here was a conductor, and he arrived to do his job. He had his own train that he was supposed to be responsible for. And because they were the only crew available, his supervisor, the yard supervisor, came up and said, hey, I need you and your crew to come out and bring this train back to the yard. And that's what he did. And so he makes a point in his argument of looking at one of the cases, I want to say it was the Angel case, where he talks about you have to look at what the individual was doing. Well, what was the individual doing here? He was a conductor who was sent out with his crew to bring a unit that had an issue back to the yard so they could figure out what was wrong with it. So the fact that he was a conductor per se doesn't have any bearing. If we want to look at what he was doing, which is what... I see why you're talking out of both sides of your mouth, because you're saying on one hand he's bringing a vehicle back to the yard that has no defect. Well, and I think, but it's also important to, there was testimony here. I understand what you're saying. There's testimony here from the gentleman with the railroad. His name just popped right out of my head. I won't remember it anyway. The gentleman with the railroad had done a series of inspections. And as he evolved his inspections, he came to the conclusion he couldn't identify what the problem was in the train. The engine was free to be used, or could be used as a single engine. But when the plaintiff here went out to take a look at that, none of the concluding had been reached. And so they were still doing an investigation to determine what was wrong with it, what could be wrong, and why they wouldn't connect. I just see two issues, and I think you can only win on one, but not both, based on your arguments. So we'll agree to disagree. Well, again, we think that the circuit court here was correct in entering a summary judgment. We think that the end-use element was not satisfying, and we think that the reasons that were articulated by the circuit court here are sound, and they're in line with the Beilu case and the other cases that have been decided. And when we look at the reply brief and the way that counsel has argued the reply brief, it does seem like they're advocating for a bright-line test based upon the location of the train on a main line and the fact that there was a so-called operational crew working the train. But that runs in the face of the cases, Beilu in particular, but of the other cases which apply a flexible analysis to make this decision. If you have an engine in a hypothetical situation where there is an established defect, but it still can run, but there's a defect as far as whether or not you can operate it, you still have to get that engine back to the yard. And when we look at the Barefield case, Barefield tells us that the end-use requirement gives a railroad an opportunity to inspect a locomotive and remedy any defect before strict liability is triggered under the Locomotive Inspection Act. That's exactly what we have here. We have a situation where the railroad should be, and it has been by the circuit court, given an opportunity to inspect and remedy any defects if they're found of a locomotive, get it back to the yard before the strict liability applies. And that's what the circuit court found. How did they get it back to the yard? Pardon me? How did they get it back to the yard from the main line? I think they operated it back. They drove it back. Right. From the main line? Right. Well, no, I think they took it on the axle line. Okay. Yeah, no, I misunderstood. They took it back on the axle line. So they had to get back to the shop, right? Right. They had to get back to the yard. Right. And just because you have, in a hypothetical, just because you have a train engine or a car that might have an issue that you need to bring back to the yard, the fact that you're bringing it back to the yard to be repaired or inspected further doesn't mean you're still in use. Again, when we look at this in a global sense and a totality of the circumstances, as Your Honor pointed out, that falls strongly in favor of this not being in use at the time of this accident. Thank you. Thank you, Mr. Conover. Mr. Bridges. So let me just address this concept of locomotive in use breaking down on the main line while it's operating. And now what does the railroad do? Well, there is a provision. It's a safe harbor provision. I address it on page one of my reply brief. It's 49 CFR 229.9. That says there's a special, when a locomotive is in use and they want to take it out of use because of a defect, they tag it and there's this whole slew of procedures you have to go through that Mr. Paulcraft and Mr. Davis indicated weren't done. So there is a safe harbor in the federal regulation when it breaks down on the line that they didn't take advantage of. They did take it out of use. So it was still in use until it gets into the stop. As far as whether the violation has to be the cause of his injury, and that is not the law. And I cite the case of Kernan versus American Judging in which it's a Jones Act case, but Jones Act and FLA are pretty much the same. And in Kernan, there was a navigation light back in the old days when it was still fire. And the federal regulation required it to be like six feet high. And that was so that other ships could see this navigation light for this little skiff in the harbor. Well, they only had it three feet high and there had been some oil spill. It started the oil on fire and it burnt the plane. It was barely hurt and sued. So obviously the regulation was not designed to protect against fires because it was designed for other people to see the light, but the United States Supreme Court said it doesn't matter. If you violate the regulation, it's a cause in whole or in part, no matter how slight, you're absolutely liable. So the fact that he was getting on the step, dealing with this violation of the communication under FLA is still a cause of the accident, and that's clear. And as far as the rocks are concerned, what we have is two claims. We have a failure to provide a reasonably safe place to work under the FLA and also a Local Inspection Act claim. So under the failure to provide a reasonably safe place to work, his theory is that they shouldn't have left the locomotive there where it was almost impossible to get on. And as he's trying to get on, I put the pictures in my brief, you can see it's like this and it's these big rocks, and he slipped and twisted his knee while trying to get on. So that's another jury question, whether it was a reasonably safe place for him to be working when they left this locomotive. If the crew was on it, they could have easily moved it back to the actual track itself. And then we started getting off on these tracks about, when I pled violation of the regulation, which is a violation of the Locomotive Inspection Act, and there's plenty of evidence that this violated the regulation, it was a repeat offender. Paul's graph, their train master wrote for him in a pension set, looked at the records, it's an exhibit at his deposition. How many times has this locomotive had the same problem where it wouldn't communicate? And he says, yeah, it's right in here. It's a repeat offender for the same problem. So there's a jury question there as to whether or not the failure to communicate was a violation of the regulation, and I think the jury could say it's a repeat offender, it wouldn't communicate, it was cut off the rest of the train because it wouldn't communicate. That's enough circumstantial evidence and evidence for us to answer a special interrogatory that says, yes, this locomotive was in violation of this regulation. So that's automatically a violation of the Locomotive Inspection Act, automatically a violation of the FVLA, and a jury could say that that violation played some part, no matter how small, in causing Mr. Davis's injury. And so the circuit court granted summary judgment on both the FVLA count and the locomotive inspection count, and I respectfully ask that you reverse that and send it back to Judge Shippwood so we can have a jury trial and decide whether or not Mr. Davis is entitled to compensation for his injury that happened at work while working for the railroad. Thank you, Justice. Thank you, Mr. Shippwood. And thank you both for your argument today. We will take this matter under advisement. The fact that it was written as a position, whether it's short-term or not, is what you said. Please rise. The court stands in recess.